UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JULIO BUSTILLO-LARA,

    Petitioner,                                    Hon. Paul L. Maloney

v.                                                    Case No. 1:07-CV-863

MARY BURGHUIS,

    Respondent.
_____/

## REPORT AND RECOMMENDATION

This matter is before the Court on Bustillo-Lara's petition for writ of habeas corpus. In accordance with 28 U.S.C. § 636(b) authorizing United States Magistrate Judges to submit proposed findings of fact and recommendations for disposition of prisoner petitions, the undersigned recommends that Bustillo-Lara's petition be **denied**.

## BACKGROUND

As a result of events that occurred on October 9, 2004, Petitioner was charged with second degree murder. Several individuals testified at Petitioner's bench trial. The relevant portions of their testimony are summarized below.

**Valentin Turcios**

As of October 9, 2004, Petitioner lived with Turcios. (Trial Transcript, February 2,

2005, 11-12). Between 1:00 and 2:00 a.m. that morning, Turcios was preparing breakfast when Petitioner began arguing with Turcios' friend, David Pena. (Tr. 12-13). The argument began when Petitioner "grabbed two beers" that belonged to Pena. (Tr. 13). Pena responded by telling Petitioner, "don't grab what's not yours." (Tr. 13). Petitioner then threw a twenty dollar bill at Pena and stated, "I'm paying you $10 for each beer." (Tr. 13). Pena then stated to Petitioner, "you have burned the name of my son." (Tr. 14). Soon thereafter, Turcios turned around and witnessed Petitioner withdrawing a knife from Pena's chest. (Tr. 13-25). Pena was not armed. (Tr. 29). Petitioner then carried Pena's body to a car and drove away. (Tr. 26-29). Petitioner returned 25-30 minutes later and reported that he had dumped Pena's body near "Hippie's house." (Tr. 29).

On cross-examination, Turcios acknowledged that when he was initially questioned by the police he stated that he saw Petitioner stab Pena. (Tr. 36). Turcios testified that he made this statement because his "mind was traumatized." (Tr. 36). Turcios reiterated his previous testimony that while he did not actually observe Petitioner striking Pena with the knife, he did witness Petitioner withdraw the knife from Pena's chest. (Tr. 38).

**Jenny Bustillo-Lara**

Bustillo-Lara is Petitioner's sister. (Trial Transcript, February 2, 2005, 55). Bustillo-Lara was present at Valentin Turcios' residence in the early morning hours of October 9, 2004. (Tr. 55-57). At approximately 2:00 a.m. Bustillo-Lara walked into the kitchen and witnessed Petitioner stab David Pena. (Tr. 56-57). Pena was not armed. (Tr. 57). Petitioner then carried Pena's body outside and drove away. (Tr. 58). Petitioner told his sister that he was going to dump Pena's body "at the Hippie." (Tr. 58).

2

**Wendy Mejia**

As of October 9, 2004, Mejia was Petitioner's live-in girlfriend. (Trial Transcript, February 2, 2005, 68). At approximately 2:00 a.m. that morning, Mejia awoke and entered the kitchen where she observed David Pena bleeding. (Tr. 68-69). Mejia watched Petitioner carry Pena outside, at which point she returned inside. (Tr. 69-70).

**Carlos Bustillo**

Bustillo is Petitioner's brother. (Trial Transcript, February 2, 2005, 75-76). Bustillo was not present when David Pena was killed, but learned of his death sometime thereafter. (Tr. 76). After learning that Pena had been killed, Bustillo asked Valentin Turcios "how it had happened." (Tr. 76). Turcios told Bustillo that he did not witness Petitioner actually stab Pena. (Tr. 76-77).

**Hugo Maldonado**

Maldonado spoke with Valentin Turcios the day after David Pena's murder. (Trial Transcript, February 2, 2005, 80). Turcios told Maldonado that he had not actually observed Petitioner stab Pena. (Tr. 80).

**Moises Jimenez**

As of October 10, 2004, Jimenez was employed as a Police Officer for the City of Detroit. (Trial Transcript, February 3, 2005, 4-5). On that date, Officer Jimenez questioned Petitioner about David Pena's death. (Tr. 4-5). Jimenez first informed Petitioner of his *Miranda* rights which he subsequently agreed to waive. (Tr. 5-13).

3

Petitioner claimed that Pena's death was "an accident." (Tr. 13-15). Specifically, Plaintiff asserted that Pena was carrying a knife and indicated that he "wanted to kill" Petitioner as well as "take his own life." (Tr. 14). Petitioner stated that in response he slapped the knife away and gave Pena a hug which caused Pena to be stabbed in the chest. (Tr. 14). According to Petitioner, he placed Pena in the passenger seat of his girlfriend's car and began to drive him to the hospital. (Tr. 14). When Officer Jimenez asked Petitioner why Pena's body was found in an alley, Petitioner responded that Pena told Petitioner to "leave him there" because "he wasn't going to live." (Tr. 14).

**Julio Bustillo-Lara**

Petitioner testified that on the morning of October 9, 2004, he and David Pena were in the kitchen of Valentin Turcios' residence. (Trial Transcript, February 3, 2005, 24-29). According to Petitioner, he and Pena were both drinking when Pena grabbed a knife. (Tr. 29-31). Petitioner testified that as he tried to "pull the knife away from" Pena, he accidentally stabbed him. (Tr. 31-35). Petitioner then placed Pena in a car and began to drive him to a hospital. (Tr. 35-38). According to Petitioner, Pena stated that he did not want to go to the hospital, but instead wanted to go to his see his girlfriend, Hippie. (Tr. 38). When the pair arrived at Hippie's residence, however, nobody was there. (Tr. 38-39). Petitioner then reentered the vehicle and told Pena that he was going to drive him to a hospital. (Tr. 39-41). According to Petitioner, Pena instead instructed Petitioner to "leave me here" because "I'm not going to live." (Tr. 41). Petitioner left Pena in an alley near Hippie's residence and then returned home and went to sleep. (Tr. 41-43).

Following the presentation of evidence, the trial judge found Petitioner guilty of second degree murder. (Trial Transcript, February 3, 2005, 107). Petitioner was sentenced to serve

4

15-25 years in prison. (Sentencing Transcript, March 4, 2005, 6). Petitioner appealed his convictions in the Michigan Court of Appeals, asserting the following claims:

> I. Under the totality of the circumstances test, the Defendant-Appellant did not voluntarily waive his *Miranda* rights when he gave a statement to the police because his Honduran dialect differed from the language spoken by the interrogating officer and this violated his Fifth and Fourteenth Amendment rights.
>
> II. Defendant's conviction must be reversed where inadmissible hearsay was used to establish an element of the offense resulting in plain error; alternatively, trial counsel's failure to object denied Defendant effective assistance of counsel.

The Michigan Court of Appeals denied Petitioner's application for delayed appeal "for lack of merit in the grounds presented." *People v. Bustillo-Lara,* No. 267350, Order (Mich. Ct. App., May 31, 2006). Asserting the same claims, Petitioner moved in the Michigan Supreme Court for leave to appeal. The court denied Petitioner's request, stating that "we are not persuaded that the questions presented should be reviewed by this Court." *People v. Bustillo-Lara,* No. 131705, Order (Mich., Nov. 29, 2006). On September 4, 2007, Petitioner initiated the present action, asserting the same two claims identified above.

## STANDARD OF REVIEW

Bustillo-Lara's petition is subject to the provisions of the Antiterrorism and Effective Death Penalty Act (AEDPA), as it amended 28 U.S.C. § 2254. The AEDPA amended the substantive standards for granting habeas relief under the following provisions:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was

5

> adjudicated on the merits in State court proceedings unless the adjudication of the claim —
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The AEDPA has "modified" the role of the federal courts in habeas proceedings to "prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002).

Pursuant to § 2254(d)(1), a decision is "contrary to" clearly established federal law when "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000); *see also, Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003).

Prior to *Williams*, the Sixth Circuit interpreted the "unreasonable application" clause of § 2254(d)(1) as precluding habeas relief unless the state court's decision was "so clearly incorrect that it would not be debatable among reasonable jurists." *Gordon v. Kelly*, 2000 WL 145144 at *4 (6th Cir., February 1, 2000); *see also*, *Blanton v. Elo*, 186 F.3d 712, 714-15 (6th Cir. 1999). The *Williams* Court rejected this standard, indicating that it improperly transformed the "unreasonable application" examination into a subjective inquiry turning on whether "at least one of the Nation's jurists has applied the relevant federal law in the same manner" as did the state court. *Williams*, 529

6

U.S. at 409.

In articulating the proper standard, the Court held that a writ may not issue simply because the reviewing court "concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams,* 529 U.S. at 411. Rather, the Court must also find the state court's application thereof to be *objectively* unreasonable. *Bell*, 535 U.S. at 694; *Williams*, 529 U.S. at 409-12. Accordingly, a state court unreasonably applies clearly established federal law if it "identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular. . .case" or "if the state court either unreasonably extends a legal principle from [the Supreme Court's] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Lancaster*, 324 F.3d at 429 (quoting *Williams*, 529 U.S. at 407).

Furthermore, for a writ to issue, the Court must find a violation of Supreme Court authority. The Court cannot look to lower federal court decisions in determining whether the relevant state court decision was contrary to, or involved an unreasonable application of, clearly established Federal law. *See Harris v. Stovall*, 212 F.3d 940, 943-44 (6th Cir. 2000).

Pursuant to 28 U.S.C. § 2254(d)(2), when reviewing whether the decision of the state court was based on an unreasonable determination of the facts in light of the evidence presented, the factual findings of the state court are presumed to be correct. *See Warren v. Smith*, 161 F.3d 358, 360 (6th Cir. 1998) (citing 28 U.S.C. § 2254(e)(1)). Petitioner can rebut this presumption only by clear and convincing evidence. *Id.*

In certain circumstances, however, the deferential standard articulated above does not

7

apply. First, if the state court resolves a particular claim but fails to articulate its analysis, the Court must apply "modified AEDPA deference." *Vasquez v. Jones*, 496 F.3d 564, 569-70 (6th Cir. 2007). Under this standard, "the court conducts a 'careful' and 'independent' review of the record and applicable law, but cannot reverse 'unless the state court's decision is contrary to or an unreasonable application of federal law.'" *Id.* at 570. However, where the state court has altogether failed to review a particular claim, such is reviewed de novo. As the Sixth Circuit has indicated, where the state court clearly did not address the merits of a claim, "there are simply no results, let alone reasoning, to which [the] court can defer." *McKenzie v. Smith*, 326 F.3d 721, 727 (6th Cir. 2003). In such circumstances, the court conducts a *de novo* review. *Id.*; *see also Wiggins v. Smith*, 539 U.S. 510, 533-35 (2003) (reviewing habeas issue *de novo* where state courts had not reached the question); *Maples v. Stegall*, 340 F.3d 433, 437 (6th Cir. 2003) (recognizing that *Wiggins* established *de novo* standard of review for any claim that was not addressed by the state courts).

## ANALYSIS

**I.       Waiver of *Miranda* Rights**

As previously noted, when questioned by Officer Jimenez following David Pena's death Petitioner made various statements regarding the incident in question. Officer Jimenez testified that before questioning Petitioner, he informed him of his various *Miranda* rights which Petitioner understood and agreed to waive. Petitioner now asserts that because Officer Jimenez did not speak Petitioner's "native Honduran dialect," his purported waiver of his *Miranda* rights was not voluntary, knowing, and intelligent. Petitioner did not seek to suppress his statements to Officer Jimenez prior to trial, but instead raised this issue for the first time on direct appeal of his conviction.

8

As has been long recognized, "a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination." *Thompkins v. Berghuis*, 547 F.3d 572, 582 (6th Cir. 2008) (quoting *Miranda v. Arizona*, 384 U.S. 436, 475 (1966)). Courts "must presume that a defendant did *not* waive his rights" and the prosecutor's burden to demonstrate otherwise "is great." *Thompkins*, 547 F.3d at 582 (quoting *North Carolina v. Butler*, 441 U.S. 369, 373 (1979)). When assessing whether a defendant's waiver of his *Miranda* rights was voluntary, knowing, and intelligent, courts must examine the totality of circumstances. *See Abela v. Martin*, 380 F.3d 915, 928 (6th Cir. 2004) (quoting *Brown v. Illinois*, 422 U.S. 590 (1975)). The circumstances relevant to this inquiry include: (1) the existence of police coercion; (2) the location, length, and continuity of the interrogation; (3) the defendant's maturity and education; (4) the defendant's physical condition and mental health; and (5) whether the defendant was advised of his *Miranda* rights. *See Abela*, 380 F.3d at 928.

Petitioner has not asserted that he was subjected to any form of coercion or that the nature and circumstances of his interview were otherwise inappropriate or uncomfortable. Petitioner has not asserted that he lacked the maturity or education to understand the nature of the rights in question or the consequence of waiving such. Petitioner has not asserted that his physical or mental condition was in any sense diminished or impaired. Moreover, Petitioner acknowledges that Officer Jimenez informed him of his *Miranda* rights.

Petitioner's claim is based solely on the assertion that Officer Jimenez did not speak the same Honduran dialect as Petitioner. Officer Jimenez testified that his "natural" language is Spanish as spoken "from the region of Mexico." (Trial Transcript, February 3, 2005, 5, 18). Jimenez acknowledged that "there is a different dialect in terms of Honduras and Mexico" and that

9

"some description words" differ between the two dialects. (Tr. 18). Jimenez further observed, however, that "[o]ur dialects are not all that different in Spanish." (Tr. 6).

With respect to his interview of Petitioner, Officer Jimenez testified that before questioning Petitioner about David Pena's death he first had an opportunity "to get comfortable with the language [Petitioner] spoke." (Tr. 5). Officer Jimenez further learned that Petitioner was able to read and write Spanish. (Tr. 10). Jimenez testified that he then translated the Department's advice of rights form verbatim from English to Spanish, after which Petitioner repeated each of his rights "out loud" back to Jimenez. (Tr. 6-9). Jimenez testified that Petitioner understood the rights that were explained to him. (Tr. 8-9). Petitioner then read, initialed, and signed an advice of rights form (written in Spanish) signifying that he understood his rights. (Tr. 6-10). Officer Jimenez testified that Petitioner did not indicate that he was injured or needed medication. (Tr. 8). Petitioner was not denied the opportunity to use the bathroom or have water. (Tr. 8). Officer Jimenez did not secure Petitioner's cooperation by promise or threat. (Tr. 8-9). Petitioner then made the statements described above.

Petitioner does *not* assert that he failed to understand the *Miranda* warnings as explained to him by Officer Jimenez. In fact, Petitioner acknowledges that "he understood the words used in translating the rights, signed and initialed the waiver form, [and] did not request any clarification." Petitioner instead asserts that he is entitled to habeas relief because Officer Jimenez spoke to him using a dialect that allegedly differed in an unspecified manner. Officer Jimenez testified that Petitioner understood his *Miranda* rights as they were explained to him. Petitioner offers neither argument nor evidence that any of the alleged differences between the dialects in question implicate any of the words Officer Jimenez used to inform Petitioner of his *Miranda* rights.

Petitioner has not challenged the accuracy of the advice of rights form from which Officer Jimenez read Petitioner's *Miranda* rights. Furthermore, Petitioner has failed to demonstrate that Officer Jimenez's translation thereof was inaccurate or relied on words with which Petitioner was unfamiliar or did not understand. The evidence demonstrates that Petitioner understood and validly waived his *Miranda* rights before speaking to Officer Jimenez concerning David Pena's death. Moreover, even if the Court were to assume that Officer Jimenez, in speaking with Petitioner, utilized words with which Petitioner was unfamiliar, the result is the same. Officer Jimenez testified that Petitioner also *read* the advice of rights form and signified his understanding of such. Petitioner has not challenged the accuracy of the advice of rights form he read and signed.

Finally, even if the Court assumes that Petitioner did not validly waive his *Miranda* rights, such constitutes only harmless error. Constitutional errors occurring during a criminal trial are divided into two categories: (1) trial errors and (2) structural errors. *See United States v. Gonzalez-Lopez*, 548 U.S. 140, 148 (2006) (quoting *Arizona v. Fulminante*, 499 U.S. 279, 307-08 (1991)). Trial errors are those that occur "during presentation of the case to the jury" and whose effect can "be quantitatively assessed in the context of other evidence presented in order to determine whether [they were] harmless." *Gonzalez-Lopez*, 548 U.S. at 148 (quoting *Fulminante*, 499 U.S. at 307-08). On the other hand, structural errors "defy analysis by harmless error standards because they affec[t] the framework within which the trial proceeds and are not "simply an error in the trial process itself." *Gonzalez-Lopez*, 548 U.S. at 148-49 (quoting *Fulminante*, 499 U.S. at 309-10).

Admission into evidence of statements made in violation of the individual's *Miranda* rights is a trial error to which harmless error analysis applies. *See Fulminante*, 499 U.S. at 284-85. As the Supreme Court recently observed, in the context of a habeas corpus action brought pursuant

11

to 28 U.S.C. § 2254, a trial error is considered harmless "unless it had substantial and injurious effect or influence in determining the jury's verdict." *Fry v. Pliler*, 551 U.S. 112, 116-22 (2007). Applying this standard, the Court finds that even if Petitioner's statements to Officer Jimenez were improperly admitted at trial, such error is harmless. Petitioner did not confess to murdering Pena, but instead asserted to Jimenez that Pena's death was an accident. Moreover, Petitioner's statements to Officer Jimenez were consistent with the testimony he offered at trial. Accordingly, this claim raises no issue on which habeas relief may be granted.

**II.     Introduction of Alleged Hearsay**

Valentin Turcios testified that prior to stabbing David Pena, Petitioner stated to Pena that he was going to stab him. (Trial Transcript, February 2, 2005, 17-18). Petitioner asserts that this testimony constitutes inadmissible hearsay and that its introduction violated his constitutional rights.

Generally, errors by a state court on matters involving the admission or exclusion of evidence are not cognizable in a federal habeas proceeding. *See Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003). Habeas relief is warranted, however, if the error "had substantial and injurious effect or influence in determining the jury's verdict." *Clemmons v. Sowders*, 34 F.3d 352, 357 (6th Cir. 1994) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)). This requires Petitioner to demonstrate "actual prejudice" resulting from a constitutional error. *Clemmons*, 34 F.3d at 357.

To establish constitutional error, Petitioner cannot simply argue that the trial court's evidentiary ruling was improper, as "federal habeas corpus relief does not lie for errors of state law." *Estelle v. McGuire*, 502 U.S. 62, 67 (1991). Rather, Petitioner must establish that his conviction

violated the Constitution, laws, or treaties of the United States. *Id.* In this respect, it is recognized that "[w]hen an evidentiary ruling is so egregious that it results in a denial of fundamental fairness, it may violate due process and thus warrant habeas relief." *Bugh*, 329 F.3d at 512; *see also*, *Norris v. Schotten*, 146 F.3d 314, 328-29 (6th Cir. 1998) (citing *Estelle*, 502 U.S. at 67-68).

Fundamental fairness does not, however, "require a perfect trial," *Clemmons*, 34 F.3d at 358, and courts have defined those violations which violate fundamental fairness "very narrowly." *Bugh*, 329 F.3d at 512. State court evidentiary rulings do not offend due process unless they violate "some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Id.* (citations omitted).

First, Petitioner is mistaken that the testimony in question constitutes inadmissible hearsay. *See* Mich. R. Evid. 801(d)(2)(A) (a "party's own statement" which is "offered against" that party is not hearsay under Michigan law). The Federal Rules of Evidence contain an identical rule. *See* Fed. R. Evid. 801(d)(2)(A). Thus, there was nothing improper about the admission of the testimony in question and such did not deprive Petitioner of a fair trial. Accordingly, this claim raises no issue on which habeas relief may be granted.

### III. Ineffective Assistance of Counsel

Petitioner asserts that his trial counsel's failure to object to the introduction of the testimony by Valentin Turcios, discussed in the preceding section, violated his constitutional right to the effective assistance of counsel.

To establish that he was denied the right to the effective assistance of counsel, Petitioner must establish that his counsel's performance was so deficient that he was not functioning

13

as the "counsel" guaranteed by the Sixth Amendment. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Accordingly, Petitioner must demonstrate that his attorney's actions were unreasonable under prevailing professional norms. *Id.* at 688. In assessing such a claim, however, the Court must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the [Petitioner] must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* at 689.

Petitioner must further establish that he suffered prejudice as a result of his attorney's allegedly deficient performance. Prejudice, in this context, has been defined as "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Mahdi v. Bagley*, 522 F.3d 631, 636 (6th Cir. 2008). This is a heavy burden for Petitioner to meet, because he must establish that his counsel's performance was "so manifestly ineffective that defeat was snatched from the hands of probable victory." *Jacobs v. Mohr*, 265 F.3d 407, 418 (6th Cir. 2001).

As discussed above, an objection to the testimony in question would not have been successful. It does not constitute deficient performance to fail to assert a meritless objection. This claim, therefore, raises no issue on which habeas relief may be granted.

## **CONCLUSION**

For the reasons articulated herein, the undersigned concludes that Petitioner is not being confined in violation of the laws, Constitution, or treaties of the United States. Accordingly, the undersigned recommends that Bustillo-Lara's petition for writ of habeas corpus be **denied**. The undersigned further recommends that a certificate of appealability be denied. *See Slack v. McDaniel*,

529 U.S. 473 (2000).

OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within 14 days of the date of service of this notice. 28 U.S.C. § 636(b)(1)(C). Failure to file objections within the specified time waives the right to appeal the District Court's order. *Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully submitted,

Date: May 28, 2010 /s/ Ellen S. Carmody
ELLEN S. CARMODY
United States Magistrate Judge